All right, Mr. Faubus. My name is Dax Faubus, and I represent Patrick Burell, and I will be arguing two issues today. First, that the trial court erred when it utilized the abusive discretion standard instead of the de novo standard in reviewing Prudential's denial of my client's benefits. Secondly, I will argue that even if you use the abusive discretion standard in reviewing the denial of benefits, the trial court erred in finding that there was no abusive discretion. My client worked for Methodist Health Care . . . Before you start that, just to sort of clear the table a little bit, I think it's not in dispute. You're not pressing your waiver of premium claim, and you're not pressing a claim that the plaintiff's wife was entitled to any benefits? We have not raised those issues on appeal, Your Honor. My client worked at Methodist Hospital System for 26 years, had worked his way up as a services supervisor for all the San Antonio area facilities, had a spotless record, was a good employee and very driven, but unfortunately, in 2008, he was diagnosed with multiple sclerosis. As that disease does, it worsened over time, and despite his efforts, by 2011, he had become too disabled to continue his job performance. He was diagnosed, ultimately, by setting, treating physicians or medical personnel with either MS itself or some related symptoms to it. He was told by his doctors that he should not be driving. They all indicated in their notes and in their reports that he had severe limitations with respect to his cognitive abilities and his physical abilities as well. He submitted a claim in September of 2011. Before you get to your claim submittal, his ceasing employment with the hospital, was that a mutually agreed thing, or did he just go in and tell them, I can't keep doing this? What's in the record along those lines? He wasn't terminated. He took a few leaves of absence and made attempts to come back, and ultimately was not able to come back because he just couldn't perform the work. There's no real formal indication of how his employment ended, except that he submitted the claim for long-term disability at the same time that he left his employment and his supervisor, his direct supervisor, issued a statement in support of that claim saying that based on his long-time observation of Mr. Burrell, that his abilities to perform his job were not there anymore. But he was not terminated. The court will note in my brief that I led off with the trial court's error in not finding an abuse of discretion over using the improper standard of review, and I did that because I wanted to make sure this court understood that whether or not you use abuse of discretion or de novo review, the trial court below erred because the evidence demonstrates that the carrier did not conduct an investigation that was adequate, and in fact, it was result-oriented towards denying the claim. But don't we have competing opinions between two sets of doctors and the decision-maker decides one over the other? I mean, do we have . . . whatever standard we use, if it's abuse of discretion or the other, is how do we decide? If it's de novo, I guess we can review it, but if it's abuse of discretion, didn't he just decide between two computing opinions as to which one, in his mind, might have more credibility? And while you might disagree, I might disagree. If we review it by abuse of discretion, we have to accept that decision. Certainly, that's generally the standard, Your Honor. That's correct. However, as this court said in Sally v. DuPont, a carrier can't simply stick its head in the investigation and then deny a claim based on a doctor's opinion of no disability when that doctor does not have full information. And that's, in my opinion, what is crucial here, because you have a scenario where the claim, the denial was appealed twice with the carrier, and ultimately, the first time any of the individuals that the carrier assigned to examine the claim, the first time any of them even met my client, much less performed an examination of him, was the last one, the last individual, Mr. Chavetz. He's not a medical doctor. He's not a doctor. That's right. And, in fact, when he conducted his two-day examination, it's a two-day examination that's his report, the one that the carrier relied on, after day one. It's dated the same day as the first day of the examination, so I assume he had already made his mind up before he went into the second full day of examination. But you're right, Your Honor. He's not a medical doctor. He's a Ph.D. And, importantly, during that appeal, there were two appeals of the denial, and during that appeal, prior to Mr. Chavetz doing his personal examination of Mr. Burrell, there were two individuals, two actual medical doctors, Dr. Osanubi and Dr. Atfield, who had written reports and had found that the MS diagnosis of Mr. Burrell was accurate. And they also found that the records and their assessment of the records, the treating physician records, all support functional impairment. Now, those reports were not given to Mr. Chavetz, the individual who conducted the personal examination. Now, the other reports that preceded those two, which said, you know, had a myriad of findings all in support of Prudential, Prudential provided those reports to Mr. Chavetz, but not the two doctors who found that there was an MS diagnosis. Now, that's important because when you look at these cases, there's generally only, you can prevail. However, one of them is, like in the Sally case, the DuPont case, where there's an inadequate investigation. But the other one is where there's procedural violations, okay? The carrier doesn't follow the procedure set out in ERISA or their own documents to determine to do an adequate investigation. And here, one of the most important aspects of those procedures is that there will be no deference to the previous appeal or the previous denial. Here, my client's claim was denied. He appealed it. It was denied. And then he appealed it again. It was denied. And then we go into the trial court. At each step of that procedure, Prudential gave the new examiners, the new doctors or PhDs, the old reports that they had relied on. And in one of those, they actually just said, I agree with Dr. Niren from before. So that's not starting anew, which is what the ERISA procedures and the planned procedures here say you got to do. But then to, if you're going to do that, you got to be consistent. And if you're going to give Mr. Chavetz, the last individual to assess this and the only one to look at, to actually meet Mr. Burrell and examine him. If you're going to give him all of your other reports and all of your other findings, then you got to give him everything. Not just the ones that you think help you. And that's what happened here. So that procedural aspect of it actually plays into both whether or not they conducted an adequate investigation, but it also goes into whether or not we should even be applying abuse of discretion standard. This court has never held this, but there are other circuits who have held, and we've had a number of other circuits that have held, if there is a complete disregard for the procedures that are set out in either ERISA or the plan, then we're not going to use de novo, excuse me, abuse of standard. We're going to use de novo. And the reason for that is obvious, because there's an inherent mistrust of what's happening in reviewing this disability claim. So, with respect to which standard we should be using, it all comes down to one question, and that is, does the administrator have the discretion to review or to make decisions on the claim? And the Supreme Court has made it very clear that the only way you can do that is to have it spelled out in the plan itself, which courts have said that's the insurance policy, the policy that governs all of these benefits, that the only way that the administrator can have the discretion is if the plan says the administrator has the discretion, and the case law is all very certain on the fact that it's got to be clear language. Now, here, in this case, the insurance policy does not provide credential with discretion. It's absolutely silent on that issue. The only document that does that is what's called the plan that, hold on, I forget what it's called. Plan summary? Yes, plan summary description, and actually it's the summary plan description, I think. Anyway, that is a document that is produced by the carrier, okay, and all it does is it's the same document that we all get when we go to work somewhere and get our first group plan and it says here's what you have, here's your coverage. It's similar to a deck page, a declarations page that you might get for your home policy or your auto policy, but it's not the insurance policy. All it is is the carrier's representation of what your coverage is, and the courts, including the United States Supreme Court, are very clear that that is not part of the plan. That's not part of the insurance policy, and even if the summary plan description says that the administrator has discretion, that's not enough because it's got to be in the policy. Now, if the policy itself integrates the summary plan description into itself, and the summary plan description has that language, well then the administrator has the discretion, but that's not what happened here. Here the insurance policy does not say, you know, this policy includes everything in it as well as the summary plan description. The summary plan description itself says, oh, by the way, your plan includes the policy and this document. Now that's the fox guarding the hen house because, remember, it's the insurance company that produces the summary plan description, and of course they want to have that discretion. They know what the law is, but the plan doesn't say that, and there's no case in this circuit or any other circuit that I'm aware of from an appellate court standpoint that says that the summary plan description can override the insurance policy itself and make its way into the plan. There's just no case that says that, but that's what the trial court here relied on, and that's why the trial court applied an abuse of discretion standard instead of de novo. What was the reason for agreeing to the magistrate judge ruling on this case? Are things really backed up in the Western District of Texas? Is that a difficulty getting . . . I don't know the answer to that, Your Honor. You didn't consent to the magistrate judge? Oh, well, I believe the way that works, and I don't recall exactly, but I don't think we did. I don't think either side consented to the case being tried by a magistrate, but I think under the procedure there that the magistrate can still be assigned to write an opinion or . . . No, no. The magistrate judge . . . the briefs say you all consented to the magistrate judge handling this case under 636. Your Honor, I'm completely ignorant. Part and parcel. Sir? I don't remember. I apologize. One question. Rarely do we see two appeals in an ERISA matter. Usually there's the claim denial and then an appeal and then actions filed in district court. In one of the briefs it said after that first appeal denial, plaintiff's lawyer, I assume you, said, well, we're going to make a demand or something of that language and got a second appeal. Yes, Your Honor. So the plan provides for two appeals? What's the basis? Well, actually it doesn't. We issued the demand intending to either resolve the matter or bring it to litigation, and the carrier treated it as a second appeal. Now, there's nothing in the plan that I'm aware of that would prevent a second appeal, but there's nothing also that would require it, and I'm not sure that it's really even spoken to. But at that time, you know, the strategy was, well, if they want to treat it that way, then let's let them do it, because maybe they'll realize the errors in their decision making. But I'm out of time, Your Honor. All right. Sir, you reserve rebuttal time? Yes, Your Honor. Five minutes for questions. Mr. Morrison? Your Honor, may it please the Court, counsel, I wanted to just address first before I start a couple of points that the Court had raised. First, Judge Barksdale, to your question, the summary judgment decision here was issued by Judge Royce Lambert, the district judge in this case. All right. Yet my case is confused. Understandably so. Secondly, counsel indicated that there was no document, no official plan document that gave discretion to Prudential, and that's not accurate. In this case, the record is clear that HCA, which was the corporate parent of Methodist Hospital and the sponsor of the plan that's at issue under ERISA, had adopted what is commonly referred to as a wrap plan document, which is a document that wraps around, as you know, a number of different welfare benefits in this case, including long-term disability. And in HCA's wrap plan document, there is a very clear statement, several clear statements, that the insurance carriers of any insured benefit have discretion to decide claims. They are made the claim fiduciary, which, for purposes of ERISA, makes them responsible for rendering decisions, and in their capacity as claim fiduciary, given discretion. Secondly, the wrap plan document makes clear— Judge Marksdale is very familiar with wrap issues. That's an inside joke. R.A.P. R.A.P., not R.A.P. I expected as much. ERISA doesn't usually engender laughs this early in the morning. Secondly, the— This is our second ERISA case of the week, and we're on a roll.         I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry. We're on a roll with ERISA, so it takes a little bit of a momentary light moment to stay with these ERISA cases, scintillating as they are. As somebody who does these for a living, Judge, I understand the challenge. The HCA plan document also does the very thing that counsel indicated was not done, and it as the documents describing the substance of the benefits provided, that the summary plan descriptions are incorporated into the official plan document. So even if this were a case where the only place there was a grant of discretion was in a summary plan description, this case would satisfy the very requirement that counsel indicated it didn't satisfy by incorporating the summary plan description into the master plan document and giving discretion to Prudential. And so for that reason, we believe that the district court correctly applied the abuse of discretion standard in this case. And on that point, as Judge Prado indicated, the test that this court applies in deciding whether a claim fiduciary under an ERISA plan has abused its discretion is really one of reasonableness. Is there some rational connection between the evidence that was presented and the outcome of the claim? And that can encompass making a decision about competing medical evidence. It's not the case, unlike in a social security case, that the plan administrator or the claim administrator has to defer to the treating physicians. They can go out and retain independent consultants to review the file and make decisions or give advice about what the medical conditions are and medical evidence is, and the insurance carrier or the claims administrator can look at those and make a decision as between competing evidence. And I believe it's even in the Gothard case from this court where the court noted that even a file reviewer sitting in Connecticut when the claimant is in, I believe it was Texas in that case, can render an opinion on what the medical evidence is and it is proper for the insurance carrier to defer to that opinion if it believes it is appropriate to do so. With that said, is it the norm with Prudential or in this milieu generally not to have actual examinations of the claimant as a matter of course? Or what was the distinction between not doing so in the first two, I guess, but doing so in the latter? Would the non-medical help us understand that environment? I would say there's not a, to answer your initial question, there's not a bright line rule or practice. These cases are handled based on the individuals who are responsible for making the decision, looking at the evidence available to them and trying to make an appropriate decision. In this instance, the first review, there was a neurologist who commented on the medical records and a nurse who reviewed all of the medical records that have been provided and that information was then reviewed by the claims examiner who issued the decision. Then on appeal to independent consultants, a neuropsychologist and a neurologist reviewed all of the medical records and came back in the case of the neurologist with an indication that really he didn't, he was questioning the MS diagnosis at all and indicating that he wasn't convinced that Mr. Burrell actually had multiple sclerosis, but even if he did, there was nothing in the medical records that objectively indicated a limitation at that time based on it. There was certainly a history of some incidents over time, but nothing at that point that would indicate either that the disease had worsened significantly since the three-year period where he had been working between 2008 and 2011 or that there was some concrete evidence of additional limitations that had showed up. The neuropsychologist reviewed in-person neuropsychological testing that had been done of Mr. Burrell and he concluded that based on his examination of the test report and the raw data from the test that the test really wasn't valid. The plaintiff's neuropsychological testing reported that Mr. Burrell was cognitively impaired. Dr. Boone, when he reviewed that information, said that you couldn't rely on that test because if you looked at the actual underlying data, there were a number of validity tests that are typically embedded into neuropsychological reviews that he failed. And that suggested that if an output saying he was cognitively impaired was not valid. Then you get to the third appeal, and again, to answer a question that you raised, Judge Barksdale, the plan actually provides, and Prudential typically provides, an optional third appeal. The ERISA claims regulations only require one, but it is common, and in this case it's contained in the Prudential ERISA statement at the end of the booklet certificate that's in the record. There's a reference to a voluntary appeal if you choose to pursue one, you don't have to. And Prudential in this case considered Mr. Faubus' letter as a second appeal and processed it accordingly. But on that second appeal, Prudential again had the file reviewed by a neuropsychologist, Dr. Atfield, and a occupational medicine physician, Dr. Osanubi. And both of them, as a result of their reviews, well, Dr. Atfield didn't opine on physical limitations because that's not his specialty, he's a neuropsychologist, Dr. Osanubi carefully reviewed, and this is documented in what are called the SOAP notes, which are sort of the claim notes in the file, reviewed carefully all of the medical information, ultimately concluded that there was a consensus among the treating doctors that Mr. Burrell had a diagnosis of multiple sclerosis, but then found specifically that he was not limited physically in any way that was going to affect his ability to do his work. But she noted that there were questions raised about whether or not he had cognitive impairments, and she noted that Dr. Boone's evaluation had said the prior in-person neuropsychological testing was invalid, and so she commented that it would be appropriate at that juncture to have Mr. Burrell examined in person by someone to do neuropsychological testing with embedded validity indicators, these tests to see if the person is actually putting out appropriate effort to answer the questions and do the tests that are presented. And Prudential then followed that recommendation. So that's one way in which insurance companies get to doing an IME, if one of the reviewing doctors says, I see a conflict, which is what Dr. Osanubi said, I see a disagreement between Drs. Martinez and Cooper, who were the plaintiff's neuropsychological testing team, and Dr. Boone, who did the review, which is that they're reaching different opinions, we should have him examined. He was then, Mr. Burrell was then sent to a neuropsychologist, and counsel has criticized Prudential for sending Mr. Burrell to a neuropsychologist for this review on the grounds that he's not a medical doctor, and I will note that, as we pointed out in the brief, neuropsychologists are the people who administer tests to determine cognitive limitations, they do a number of tests to determine whether somebody has suffered a brain injury or has cognitive impairments, and so you'll see them repeatedly popping up in these cases. Dr. Chaffetz is a PhD member of the American Board of Neuropsychology, and is trained appropriately to do the tests. He also indicated on his report that the testing was done over two days, and the report is dated after the end of the second day. There is obviously an inconsistent date in the report, but there's no other evidence to suggest that somehow he authored the report based on testing that didn't happen. But the results of his testing concluded that there were no cognitive limitations. He noted a number of areas in which Mr. Burrell had failed, the internal validity indicators that are in the testing, resulting in really inconsistent results, but ultimately gives the opinion to Prudential that there was no cognitive limitation in this case in Prudential. The decision was made that right now he's not disabled enough to not be able to be at work. I'm not sure how the plan works. Is he foreclosed from future claims? Has he left the job? Is the plan still in effect, say, if he does have MS, and as his condition deteriorates, is he still in a position to six months, a year from now, put in a claim and say, now I've gotten to the point where I'm unable to work, or is that foreclosed? That is foreclosed, because the way the plan works, and these plans work, is if you stop working because of a sickness or injury that results in your inability to work, then you're eligible for benefits. So the question is, really, what was his condition back in September of 2011 when he stopped working? When he terminated his position, the plan's no longer available to him. Right, at this point. Another point I will make is that he also has to satisfy, I believe it's 180-day, what's called elimination period, or waiting period to be eligible for the benefits to kick in. So once that's over, then the long-term disability would start, but you still have to go back to the point in time where he stopped working and examine what was his condition at that point. What was the terminate, cutoff date for any long-term disability payments, when he reached a certain age, or? They would typically cut off, I believe it's at Social Security retirement age, so 65, 67, depending on your date of birth. And how old was he when he stopped working? I believe he was 55. All right. Now, the plaintiff's lawyer states that Prudential violated the normal procedure by providing at each, at the second level of appeal and at the first appeal, prior medical documents that shouldn't have been reviewed. Now, it seems to me on the first appeal, obviously, they should look at the claim documents and the doctor's reports, but what about the second appeal? Was Prudential allowed to provide prior records for that? It's our position that they were, and that what's going on is review. The regulations and the plan documents say that we'll review, that Prudential will review the claim anew, but that, just like this Court wouldn't ignore what happened in the District Court and the evidence that was presented in the District Court, Prudential isn't going to ignore the evidence that was available before and make the, you know, insist on recreating the record completely fresh. The medical reviewers . . . I'm asking about the second appeal, though. Yes. The plaintiff's merit to not looking at the prior appeal record. Well, it's the same situation, Judge. I mean, it's still review. They do have an obligation to look at this with fresh eyes and evaluate whether or not Mr. Burrell meets the standard, which is what they did and, in fact, went and, as a result of that review, sent him for neuropsychological testing because an inconsistency between his treating physicians and the prior file reviewer had been identified. And that, if you had ignored that, I'm not sure how you would get to that conclusion. Well, speaking of looking at prior records, Dr. Atfield, who made a review . . . I don't . . . he didn't do an independent examination on this second appeal and seemed to agree with the other doctor, Orsino, Assini, whoever that doctor was, on the second appeal. You state in your brief that he didn't even issue a report. His conclusions are noted only in Prudential's internal notes on Mr. Burwell's claim. Page 40, that's where you say that. Shouldn't that be given consideration, what Dr. Atfield thought? Again, it's in the administrative record, isn't it? It is in the administrative record. And he didn't come to the conclusion, I don't believe, in the claim note that is referenced  there. He simply noted that there had been prior testing that was done that supported cognitive impairment. And the reason . . . well, there's no . . . from our perspective, no problem with the issue that counsel raised about not giving Dr. Chaffetz the Osanubi report or text from the internal file notes, which is where her report appears, and the discussion of Dr. Atfield's comments because what Mr. or Dr. Chaffetz had been asked to do was perform testing to evaluate what was Mr. Burwell's condition at that point, which is different than asking him to look at . . . you know, he's different than Dr. Boone, for example, who was the prior neuropsychological reviewer, who was asked to look at the files. You concede he has multiple sclerosis. Yes. And aren't we looking to see whether that condition or the corollary condition of depression and anxiety would preclude his working? In other words, it rendered him non . . . unsuitable for employment? Correct. And isn't that one of the things Dr. Atfield was looking at? That is correct. He was looking at that. And then the file was sent, or the file information, along with a request to do an in-person neuropsychological test was given. Why would the test by a Ph.D. on not being able to function, why would that be equal to a medical doctor's determination about whether the man can function? Well, I will point out, first of all, that the evidence in the record as to Mr. Burwell's cognitive limitations and the assertion that he is cognitively limited comes from a Ph.D. neuropsychologist. The Cooper and Martinez report was performed by a psychological group to provide that opinion. He sought therapy from psychologists, not a medical doctor. So I don't think that there is any inconsistency in stacking up Chaffetz against Cooper and Martinez to get that evaluation. And as we indicated, the right person to go to to do a detailed, multi-day neuropsychological assessment is, in fact, a Ph.D. neuropsychologist. Was this independent medical exam, was that basically to determine whether he was malingering or was it to determine whether he could function at his employment? The latter. Now, do you view the summary judgment and trial process for ERISA as being more circumscribed than just any normal action in district court? It certainly is under the abuse of discretion standard because what the court is doing in that instance is looking . . . I understand that, but I'm talking about just the normal procedures, genuine dispute of material fact at summary judgment and a trier of fact if we find the summary judgment was proper. Do you think there's some limitations if we remand for trial that are inconsistent with other trials other than what standard of review? Are there tests to be applied? Certainly. The tests to be applied would be different. The evidence to be considered would be different because we're limited to the administrative record that was created. So you essentially have an artificial construct. And I'll say that the Sixth Circuit, in a case called Wilkins versus, I think, Baptist Health Care, probably 12, 15 years ago, essentially said that courts should not use the summary judgment paradigm in these cases because you're not asking this question of whether or not there's a material issue for trial. You're simply applying one of two standards of review to a closed record just as you would in an administrative agency review case. And so sending it back for a trial would leave a judge scratching his or her head as to what exactly they're supposed to be doing. You know, if the court were to find that the de novo standard of review applied here, certainly this court would need to remand the case back to the district court because there has been no assessment by the lower court as to whether or not Prudential was de novo right or wrong. But even under the abuse of discretion standard, if the trier of fact found it was arbitrary and capricious what Prudential did here, that would be a finding of fact. Would that be a bench trial or would that be a jury trial? It would be a bench trial. Is that required by ERISA or is that just a general practice? It is required by ERISA and there's a number of cases that have gotten into this issue. I apologize, I don't have the citations all handy. But the analysis has been that the relief is functionally equitable relief and therefore there is no entitlement to a jury trial and that is certainly the consensus among courts in this country. So for all of these reasons and those stated in our brief, we would ask that the court affirm the judgment of the district court. All right. Thank you, Mr. Morrison. Back to you, Mr. Faubus. Justice Barksdale, you're correct that Chaffetz's finding, which is what Prudential relied on, was that Mr. Burrell was malingering, in other words, faking to a certain extent the symptoms. Now, that brings the Prudential's failure to provide Atwell and Olsen-Ubey's findings, make those available to Chaffetz even greater because Mr. . . . excuse me, Dr. . . . But isn't it correct, though, what's principally going on at that stage is testing? Oh, right. What's principally going on is testing for the cognitive abilities or impairments, etc. So if you're talking about testing, which is what this battery that's done by the neuropsychiatrists, it's the metrics, it's that. So even with somebody else's testing, it's just not the same as reviewing medical examinations. You're just talking about testing. So assuming, for purposes of the question, that at this stage it's really, in other words, the way I view it, if there was a dispute about whether he had MS, you know, we're into the medical diagnosis of the condition. There seemed to be no dispute about the fact that he had MS, which was the medical piece. The dispute rolls over with that condition, whether or not he had cognitive impairments such that he can't work, da-da-da-da-da. So I get it. It's sort of out of the medical range, but into this hyper-technical testing arena. So why does it necessarily matter if it's just another person applying, quote, the testing, whether they have the other two tests, you know, that were given? I mean, you've got metrics as opposed to actual examination. Do you follow what I'm saying? And Your Honor, it matters because Mr. Chivette's found that there was cognitive disability in Mr. Burrell. But importantly, his findings with respect to MS, he states plainly, inconclusive. Now, and he ultimately finds instead malingering. He doesn't have the benefit of Dr. Atwell's findings, which are that there is no malingering. No behavioral observation suggests suboptimal effort or other motivational factors. If he has that, instead of all these other doctors who are simply, you know, giving prudential what they want, if he has that finding, well maybe there isn't an inconclusive finding with respect to MS. But the very fact that Mr. Chivette's, his assessment regarding MS was inconclusive, is enough to say that that investigation was inadequate because prudential did nothing to follow up on that. And either, under either standard de novo or abuse of discretion, it still would result in a reversal? That's correct.  And importantly, with respect to abuse of discretion, one thing that the trial court completely did not address, in its opinion, is the fact that one of the doctors who assessed the medical records for Mr. Burrell, one of its doctors, Mr. Isaacson, made a finding of clinical depression and anxiety. That was his finding. And that is a separate ground for long-term disability, aside from MS. Now, Dr. Isaacson said, I'm not going to expand on this because it's beyond the scope of my assignment. Importantly, again, once again, there's a diagnosis finding in which prudential does not follow up on it. It does not look into it. But if it does, and in fact it turns out that Mr. Burrell had a clinical diagnosis of depression and anxiety, that would be a separate ground for long-term disability, with respect. We keep hearing about cognitive disability. Was there any physical limitations that were observable? Well, we wouldn't necessarily call cognitive. If he, for example, if he had to use a wheelchair or something of that nature. I'm no expert on MS, Your Honor. However, my understanding is that it essentially. No, sir, I want to know what's in the record. Was he able to walk normally? He, it breaks down the ability of your brain to talk to your body. At some point, in the record, there's evidence that trying to get out of bed, he broke his foot because he did not have the ability to control his body. Do you, is it clear from your standpoint that, I mean we get lots of these ERISA plans, but in the plan it issued that it does accord discretion to the plan administrator to make the ultimate decision? No, Your Honor. I do not agree with that. The, again, the Supreme Court has told us that it's the insurance policy. Only the insurance policy can either grant discretion or pull some other document into it that grants discretion.  I mean, we've got VEGA and our in-bank case, all these where, you know, there's conflicts, et cetera, we get away from the main premise. But we don't have a VEGA situation. There's no assertion of conflict, et cetera. Well, there is not. Okay. In my opinion, because the insurance policy, this is a huge question in ERISA. Whether or not the administrator has discretion is a huge issue. Oh, I get that. And so when the policy is silent as to that, what that's saying is you don't have discretion. And the same document that counsel referred to earlier, the wraparound document, here's what it says. It says, for each insured benefit program, the long-term disability would be the one that we're talking about here, the insurance contract for that benefit program serves as the official plan document. It doesn't say the insurance contract and the summary plan or anything else. It just says the insurance contract. So you urge consistently in the briefing or otherwise that the governing ERISA plan documents do not accord discretion to the administrator to make this ultimate determination. That's the assertion you make, right? That's absolutely right. Because you acknowledge if it does, under our cases, abuse of discretion is a standard. Irrespective of whether we're talking about a Rule 56 vehicle for being there, but our cases clearly say if the plan document, the controlling document, best discretion in the plan administrator, we're talking about abuse of discretion. That's why I want to be clear that I heard your argument about the summary plan, et cetera. Counsel opposite says, well, it's all enveloped and so forth, but I just want to be clear, at least I leave the bench understanding that you're of the view that the governing plan, and we'll look at it, does not vest in the plan administrator discretion on this ultimate issue. Correct? That is correct. That's the assertion you make. All right. That is correct, Your Honor. Okay. All right. I'm clear. Other questions from the panel? Anybody? All right. We'll go back to ERISA 101 and we will figure it out. Thank you, counsel, for your briefing. Before we call up the third case for argument, we'll take a real short recess. We'll be back.